**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-704 (CRC)** |
| **v.** | : | |
| | : | |
| **TIMOTHY EARL O'MALLEY,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Timothy Earl O'Malley to a split sentence of forty-five days' incarceration, three years' probation, sixty hours of community service, and $500 restitution.

I.    <u>**INTRODUCTION**</u>

Timothy Earl O'Malley is a commercial fisherman who participated in the January 6, 2021, United States Capitol siege—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than one million dollars of property damage.

O'Malley pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of forty-five days' home detention is appropriate in this case because O'Malley: (1)  prepared for violence by bringing a softball helmet with a full facemask to Washington, D.C.; (2) was at the front line of a group of rioters who overwhelmed a line of police officers in the Brumidi Corridors; (3) was part

of a group of rioters who passed within inches of a door that led directly onto the Senate Floor; (4) filmed a selfie-style video of himself in the Senate Reception Room yelling: "WE TOOK THE CAPITOL. WE'RE MOVING ON TO OTHER FLOORS NOW. WHOO! OUR HOUSE!"; (5) continued to shout and encourage the mob after leaving the Capitol building, shouting: "THEY TRIED TO TRAP US INSIDE. BUT WE FOUGHT OUR WAY, ALL THE WAY IN THERE. AND WE FOUGHT OUR WAY BACK OUT, AND THEY TRIED TO TRAP US. WE'RE OUTSIDE. WE SWARMED THE CAPITOL, THOUGH. HOT DAMN, LEADING THE CHARGE. GETTIN' IT ON."; (6) after leaving the Capitol building, went to the East Front of the building and climbed to the top of the stairs to a point just outside of the East Rotunda Doors where he filmed another video yelling: "OUR HOUSE! TAKE IT BACK, IT'S OUR HOUSE!"; (7) in the days following January 6, sent text and media messages to at least two individuals, one of whom told the FBI that it seemed to him that O'Malley was proud of having attended the protest and believed in what he had done; and (8) has a history of felony and misdemeanor convictions dating to 1978 and continuing at regular intervals through the present conviction.

At this time, the government has nothing to suggest that O'Malley personally engaged in violence or property destruction during the siege. The government does not view O'Malley's restraint in this regard as a mitigating factor. Had he engaged in those activities, the government likely would have presented felony charges to the Grand Jury. A defendant's abstention from violence and property destruction is only of limited utility in the misdemeanor sentencing analysis.

The Court should also consider that O'Malley's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification

vote. Here, O'Malley's preparation for violence, his celebration and endorsement of the violence on that day, his lack of remorse, and his criminal history renders a sentence of incarceration both necessary and appropriate in this case.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

*The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol that the parties agreed to as part of the Statement of Offense. ECF No. 20, ¶¶ 1-7. In doing so, however, the government in no way intends or wishes to deemphasize the importance of acknowledging that each participant in a riot is part of that riot. As Judge Chutkan recognized, "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." *United States v. Matthew Mazzocco*, 21-CR-54 (TSC), ECF No. 32, p. 25. Judge Lamberth similarly wrote,

> Some of the rioters—now defendants in criminal cases—directly contributed to this violence by assaulting members of law enforcement or by planning, preparing, and facilitating this violence. Others, like Little here, did not directly assault officers. But even Little and those who engaged in this "lesser" criminal conduct were an essential component to the harm. Law-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, p. 2. From the most mundane actions to the most violent, each rioter contributed directly and indirectly to the violence and destruction of that day, including Timothy Earl O'Malley.

*Timothy Earl O'Malley's Role in the January 6, 2021, Attack on the Capitol*

Timothy Earl O'Malley maintains that his only reason for travelling to Washington, D.C., was to attend the rally planned by the former president, Donald J. Trump. He claims to have travelled by himself from northern Florida to Washington, D.C., in his truck. In preparation for the events of the day, O'Malley decorated a metallic red Rawlings Vapor softball batting helmet that

had a face guard with two large red stickers with white lettering stating: TRUMP IS MY PRESIDENT. O'Malley claims to have worn the helmet because his biggest fear in attending the rally was that members of Antifa might throw objects. O'Malley had heard that Antifa had sacks of concrete rocks and he wanted to protect himself. Wearing the helmet and anticipating a conflict with Antifa, O'Malley attended the rally where the former president spoke and then followed the crowd to the Capitol.

 

*IMAGE 1* and *IMAGE 2* (l to r)—O'Malley posing for a picture that shows the front and side of the helmet he chose to wear to the January 6, 2021, rally.

A group of rioters breached a fire door next to the Senate Parliamentarian's Office—sometimes referred to as the Parliamentarian's Door—at approximately 2:42 PM. The rioter who caused that breach did so by using a metal walking cane to break out one of the windows. The Parliamentarian's Door is the breach location where O'Malley entered the Capitol approximately ten minutes later.

During a pre-arrest interview with the FBI, O'Malley stated that he would describe the scene at the Capitol as "mayhem." This is corroborated by various surveillance images taken around the time that the window of the Parliamentarian's Door was broken out and that entrance

breached and the time when O'Malley himself entered. Most rioters gained entry to the Capitol

Building on January 6 as part of chaotic and violent throngs.



***IMAGE 3***—*An open-source intelligence (OSINT) map created by private citizens—known by their handles @ne0ndistraction and @sansastark525—and available at https://jan6attack.com/maps.htm. All time shown on USCP CCV screenshots are in Coordinated Universal Time (UTC), where, for example, 19:42 is equal to 2:42 PM. A larger version of this map is appended as an attachment.*





*IMAGE 4* and *IMAGE 5* (top to bottom)—Screenshots from USCP CCV showing the West Lawn and West Plaza as they appeared on January 6, 2021, at 2:42 PM, the approximate time that a group of rioters were breaching the Parliamentarian's Door. In this and all other sreenshots from USCP CCV, the time shown is in Coordinated Universal Time (UTC), which is approximately five hours ahead of Eastern Time on January 6. Ex. 19:42:29 = 2:42:29 PM.





*IMAGE 6* and *IMAGE 7*—*Screenshots from USCP CCV showing the (top) Northwest Lawn, Pennsylvania Lawn, Northwest Terrace, and the north side of the West Plaza; and (bottom) the Northwest Terrace and Northwest Plaza as they appeared on January 6, 2021, at 2:42 PM, the approximate time that a group of rioters were breaching the Parliamentarian's Door. The Parliamentarian's Door is indicated with a red arrow. The Senate Wing Door—the first brech point of the Capitol—and the two windows flanking it can be seen in the background just above the heads of the rioters.*





*IMAGE 8* and *IMAGE 9*—*Screenshots from USCP CCV showing (top) O'Malley entering the Capitol through the Parliamentarian's Door at approximately 2:51 PM; and (bottom) O'Malley pushing his way forward through the crowd, deeper into the Capitol at apprixmately 2:52 PM. The red star in this and all other inset maps corresponds to the approximate location of the defendant inside of the Capitol building at the time indicated by the screenshot.*

O'Malley stated that he felt as though he was pushed or herded into the building. This is inconsistent with surveillance videos showing O'Malley deliberately moving forward through the crowd and into the Capitol, entering the Capitol through the Parliamentarian's Door at approximately 2:51 PM. O'Malley continued walking north through the Brumidi Corridors before turning east. About halfway down that hallway, O'Malley was at the front of a group that confronted a line of police officers. These officers attempted to divert the rioters to their left and out the North Door of the Capitol, but at approximately 3:01 PM, the rioters overwhelmed law enforcement and continued east.



***IMAGE 10***—*Screenshot from USCP CCV showing O'Malley at the front of a group of rioters pointing his finger at law enforcement who are attempting to keep the rioters from continuing north.*

Before reaching the end of the hallway, the rioters went up a staircase—pictured below in Image 11. At the security desk, O'Malley turned right and entered the Senate Reception Room where he filmed a selfie-style video. In that video, O'Malley yells: "WE TOOK THE CAPITOL. WE'RE MOVING ON TO OTHER FLOORS NOW. WHOO! OUR HOUSE!"







*IMAGE 11* and *IMAGE 12a, 12b, and 12c*—*(top) USCP CCV showing O'Malley walking past a security desk just outside the floor of the Senate Chamber; and (bottom) three screenshots from a selfie-style video O'Malley recorded of himself in the Senate Reception Room.*

From there, O'Malley walked south past the elevators (3:03 PM) and was directed by law enforcement to go down a staircase and exit the building Capitol (3:04 PM). O'Malley left the Capitol through the North Door at approximately 3:07 PM.





*IMAGE 13* and *IMAGE 14* *(top to bottom)—After leaving the Senate Reception Room, O'Malley walked south and descended the Goodman Staricase.*





***IMAGE 15*** and ***IMAGE 16*** *(top to bottom)—Once back on the First Floor of the Capitol, O'Malley returned to the Brumidi Corridors and the North Door, but this time he went out, exiting the Capitol through the North Door at approximately 3:07 PM.*

Outside of the Capitol, O'Malley recorded at least two additional videos to which he provided narration. In the first of those two, O'Malley shouted: "OUR HOUSE! TAKE IT BACK, IT'S OUR HOUSE!"

In the second, O'Malley appears to have made his way to the East Plaza of the Capitol and to have climbed the Central East Steps. While back amongst the rioters and just outside the East Rotunda Door, O'Malley yelled: "THEY TRIED TO TRAP US INSIDE. BUT WE FOUGHT OUR WAY, ALL THE WAY IN THERE. AND WE FOUGHT OUR WAY BACK OUT, AND THEY TRIED TO TRAP US. WE'RE OUTSIDE. WE SWARMED THE CAPITOL, THOUGH. HOT DAMN, LEADING THE CHARGE. GETTIN' IT ON."

Although O'Malley remained on restricted grounds after leaving the Capitol, the government has no evidence that O'Malley reentered the Capitol Building. In total, O'Malley spent approximately sixteen minutes inside the Capitol. O'Malley admitted that he knew at the time he entered the Capitol that he did not have permission to do so, and while inside he paraded, demonstrated, or picketed.

### *Timothy Earl O'Malley's Interview*

Prior to his arrest, O'Malley agreed to speak with the FBI and discussed with agents his conduct on January 6, 2021. O'Malley has been forthcoming to the FBI throughout the investigation, charging, and prosecution processes. To the government's knowledge, O'Malley has eschewed social media and has not attempted to publicly defend his actions or the actions of others who were part of the Capitol siege on January 6, 2021. Although it appears that O'Malley was prepared for violence and engaged in troubling rhetoric while in and around the Capitol—claiming to have taken the Capitol, swarming the Capitol, leading the charge, etc.—there is no evidence that he engaged in violence against law enforcement or others on January 6, 2021.

### III. THE CHARGES AND PLEA AGREEMENT

On June 28, 2021, O'Malley was charged via Criminal Complaint with violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 30, 2021, he was arrested at his home in Pensacola, Florida. On December 1, 2021, Timothy Earl O'Malley was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 15, 2021, O'Malley pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol building. By plea agreement, Timothy Earl O'Malley agreed to pay $500 in restitution to the Department of the Treasury.

### IV. STATUTORY PENALTIES

O'Malley now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, O'Malley faces a term of imprisonment up to six months and a fine of up to $5,000. O'Malley must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### V. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this Class B misdemeanor case, 18 U.S.C. § 3553(a) informs the factors the Court must consider in crafting a sentence that is sufficient, but not greater than necessary to achieve the goals under that same section. This section identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the § 3553(a) factors weigh in favor of a split sentence of a forty-five-day term of incarceration followed by a three-year term of probation.

## VI. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The siege of the Capitol on January 6, 2021 is an unparalleled criminal offense in American history. It represented a grave threat to our democratic norms. It was the one of the only times in our history when the building was occupied by rioters who were hostile to American democratic norms and processes.

Each defendant should be sentenced based on their individual conduct. This Court should note that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they would have—at a minimum—crossed through numerous barricades and stepped or climbed over numerous barriers. They would have heard the cries and throes of a mob. Depending on the timing and location of their approach, they may have also observed fighting with law enforcement officials and smelled chemical irritants in the air or felt the effects of the same in their eyes. No rioter was a mere tourist that day.

This was certainly true for O'Malley who approached from the west. As shown in Images 3 through 7, thousands of protestors had descended on the Capitol at around the time that O'Malley approached the Capitol. He would have seen the fallen and trampled barriers around the West Lawn. O'Malley would have seen and heard the chaos on the West Plaza and heard the chants and cries as the rioters broke into the Capitol through the Parliamentarian Door. *See* "West Capitol Plaza & 'Tunnel' - 2:27-3:21 pm – Jan 6th" (https://youtu.be/N562Ti_vI9A?t=877). The second breach of the Senate Wing Door—a violent and aggressive concerted effort by the rioters that occurred mere yards away from the Parliamentarian Door—happened at 2:48 PM, so O'Malley would certainly have heard the shouting and seen the violence happening in the same

Plaza where he was. The surveillance screenshots included above show that O'Malley's initial claim that he was pushed into the Capitol is untrue.

While looking at each defendant's individual conduct, tthis Court, in determining a fair and just sentence should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

O'Malley did not travel in his truck all the way from northern Florida to Washington, D.C., to be a mere witness to the events of the day. He planned on being where the action was. He not only prepared himself with a helmet, but he decorated it with various stickers. He made sure that his helmet had a facemask. It appears in Images 11 and 16 that he is also wearing kneepads. Image 10 is especially concerning given that it shows how O'Malley went to the front of a group of rioters and aggressively engaged with the outnumbered officers attempting to hold them back. As mentioned above, the line eventually fell, and the group that O'Malley led—even if for only a moment—made its way to the second floor. While on the second floor and whether he realized it or not, O'Malley himself came within steps of the Senate Floor, a  space where few civilians are ever permitted to set foot. It is also significant that while in the Senate Reception Room, O'Malley

filmed a video in which he claimed: "WE TOOK THE CAPITOL. WE'RE MOVING ON TO OTHER FLOORS NOW. WHOO. OUR HOUSE!"

O'Malley quickly accepted responsibility, but the Court should view such expressions of remorse with a grain of salt. As several other sentencing proceedings for these defendants have shown, the expression of remorse can be an unreliable watermark in January 6 cases. As Judge Chutkan explained:

> And I take into account the government's statement and [defense counsel]'s statement that he accepted early responsibility. But [the defendant's] remorse—and I believe his remorse is sincere—[the defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.

*United States v. Matthew Carl Mazzocco*, 21-CR-54 (TSC), ECF No. 32, pp. 29-30. Judge Lamberth expressed more skeptical views:.

> The Court often finds it difficult to ascertain the sincerity of these particular defendants' remorse. Many defendants appear sincere at sentencing, boasting of their purportedly deep shame, regret, and desire to change and be law-abiding citizens. But this Court is all too familiar with crocodile tears. Indeed, one day after being sentenced to probation, another January 6 defendant made statements in an interview that directly conflicted with the contrite statements that she made to the undersigned.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, pp. 3-4.

Accordingly, the nature and the circumstances of this offense render the government's proposed sentence sufficient but not greater than necessary to reflect the seriousness of the instant offense, to promote deterrence, to protect the public from future crimes that may be committed by the defendant, and to avoid unwarranted disparity.

## VII.    O'MALLEY'S  HISTORY AND CHARACTERISTICS

As set forth in the PSR, Timothy Earl O'Malley has a significant lifelong criminal history dating back to 1978 and stretching through 2009 that includes four convictions for driving under the influence, three theft convictions, and a battery conviction. ECF No. 25, pp. 10-20. He has

several other arrests. As of the writing of this memorandum, O'Malley has been compliant with his conditions of pre-trial release. One especially concerning aspect of O'Malley's criminal history is an inability to abide by terms of probation/post-release supervision when such a penalty is imposed.

With these considerations in mind, it appears that specific deterrence in the form of incarceration is necessary, and that further, a split sentence of a forty-five-day term of incarceration followed by a three-year term of probation with the specific conditions recommended by the government would serve to specifically deter O'Malley—and others generally—from engaging in similar violations of law in the future.

## VIII.   THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE AND PROMOTE RESPECT FOR THE LAW

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of a split sentence of a forty-five-day term of incarceration followed by a three-year term of probation and should not be probation only. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

## IX.    THE NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As discussed above, O'Malley's behavior while on the restricted grounds of the Capitol and while inside as well as the videos he recorded praising and encouraging the violent takeover of the Capitol weigh on the side of incarceration. O'Malley's quick acceptance of responsibility and his post-January 6 compliance with Pretrial temper the length that the government believes to be sufficient but not greater than necessary to achieve the goal of specific deterrence.

While entering restricted grounds and moving ever forward, O'Malley did not turn back when he saw the downed fence and barricades. He went forward. He did not turn back when making his way through the increasingly frenzied crowd on the west front or when he saw and heard the violence taking place in the location on the Lower West Terrace known as The Tunnel. O'Malley went forward. He led rioters in the Brumidi Corridors who were attempting to break through a line of law enforcement. He justified his actions and even claimed victory, shouting: "WE SWARMED THE CAPITOL, THOUGH. HOT DAMN. LEADING THE CHARGE. GETTING' IT ON."

As Judge Chutkan stated:

> What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.

*U.S. v. Mazzocco*, ECF No. 32, p. 24. O'Malley was at times both a passive and active participant in that mob, and specific deterrence is necessary. The government believes that its recommended sentence will achieve the Congress's established sentencing goals.

## X.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on law enforcement, to conspiracy to corruptly interfere with Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not become the default.[3] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

---

[2] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[3] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with fewer days incarceration or home detention.

O'Malley has pleaded guilty to Count Four of the Information, charging him with willfully and knowingly parading, demonstrating, or picketing in any of the Capitol Buildings, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), whether they destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir.

2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentence Judge Walton imposed on Jeffery Alexander Smith (21-CR-290 (RBW)), specifically a split sentence of a ninety-day term of incarceration followed by a twenty-four-month term of probation. Smith entered the Capitol through the Upper West Terrace Door but made his way to the Rotunda and assisted in what was the second breach of the East Rotunda Doors. *See United States v. Jeffrey Alexander Smith*, 21-CR-290 (RBW), ECF Nos. 36, 42, 44. Like O'Malley, Smith only left the Capitol when physically directed out of the Capitol by law enforcement. The fact that Smith played an active role in the breach of the East Rotunda Doors is an aggravating factor that O'Malley lacks, but O'Malley, like Smith, stood his ground against law enforcement—just in a different part of the Capitol. Just as

the imposition of a split sentence was appropriate in the case of Smith, so too is it appropriate in this case.

Taking into account O'Malley's criminal history, the government's request avoids unwarranted sentencing disparities. Two other defendants whose criminal history served as a determining factor at sentencing are Robert Bauer and Edward Hemenway, who were charged as co-defendants in *United States v. Robert Bauer and Edward Hemenway*, 21-cr-49 (TSC). The government requested thirty days of incarceration and $500 in restitution for both those defendants. Both Bauer and Hemenway entered guilty pleas to the same count as O'Malley (one count of 40 U.S.C. § 5104(e)(2)(G)) after being charged by Information with the same four charges that were charged against O'Malley (18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G)). Judge Tanya S. Chutkan sentenced both Bauer and Hemenway to 45 days of incarceration, 60 hours of community service, and $500 in restitution.

To support its request for thirty days' incarceration of Bauer, the government pointed to the following factors: (1) although Bauer admonished other rioters not to assault law enforcement officers, he treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised; (2) Bauer remained inside the Capitol for a brief period of time – approximately seventeen minutes – yet made his way into the Crypt, where police officers were being attacked; (3) Bauer admitted to his actions only two days after the riot and accepted responsibility early through a plea agreement; (4) Bauer has not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong"; and (5) Bauer has a serious criminal history. The government relied on many of the same factors regarding Hemenway, with the differences being that Hemenway did not

admonish other rioters to not assault law enforcement, admitted to his actions a few days after the riot, and expressed remorse for his actions. 21-cr-49, ECF No. 33 at 2.

Bauer's criminal history involved Operating a Motor Vehicle Alcohol-Drugs in 1999, when he was 21 years old; Possession of Anhydrous Ammonia and Vandalism in 2005; Possession of Methamphetamine, Manufacturing Methamphetamine and related charges in 2005; and Unlawful Possession of Meth Precursor in 2006. *Id.* at 11-12. Hemenway's criminal history dated back to 2004 and involved a conviction for Sexual Battery and Criminal Confinement in 2006. 21-cr-49, ECF No. 32 at 11.

Like O'Malley, neither Bauer nor Hemenway was personally involved in acts of violence or destruction, although all three did see officers assaulted by rioters. Bauer admonished other rioters not to assault law enforcement. Bauer, Hemenway, and O'Malley all accepted responsibility early. O'Malley has a longer criminal history than Bauer or Hemenway and was inside the Capitol for a longer period of time than they were. The sentences requested and imposed for Bauer and Hemenway show that the requested sentence for O'Malley avoids unwarranted sentencing disparities.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

Case 1:21-cr-00704-CRC   Document 30   Filed 04/05/22   Page 26 of 36


differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## XI.   THE COURT'S LAWFUL AUTHORITY TO IMPOSE A SPLIT SENTENCE

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

court may impose a term of continuous incarceration that exceeds two weeks[4] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[5] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this

---

[4] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10). *See* Part II *infra*.

[5] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in*

*conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a

prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. O'Malley pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1. Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of

> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[6]

### A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of

---

[6] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[7]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improved or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in O'Malley's case given the requested forty-five-day term of incarceration.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

---

[7] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## XII.    <u>CONCLUSION</u>

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Timothy Earl O'Malley to a split sentence of a forty-five-day term of incarceration followed by a three-year term of probation, sixty hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
D.C. BAR NO. 481052
ACTING UNITED STATES ATTORNEY


By:  _____
Sean P. Murphy
D.C. Bar No. 1187821
Assistant United States Attorney
U.S. Attorney's Office—District of Puerto Rico
Torre Chardon, Ste 1201
350 Carlos Chardon Avenue
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov