IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.                  Case No.: 1:21-cr-704-CRC

**TIMOTHY EARL O'MALLEY,**

    Defendant.

## DEFENDANT TIMOTHY EARL O'MALLEY'S SENTENCING MEMORANDUM

Defendant, TIMOTHY EARL O'MALLEY, submits this Sentencing Memorandum in this matter. The Defense requests that this Court sentence Defendant, TIMOTHY EARL O'MALLEY, to a sentence of probation with community service work and the Five Hundred Dollar ($500.00) restitution to which Defendant TIMOTHY EARL O'MALLEY has already agreed to. The history of the events of January 6, 2021 at the United States Capitol is well known to this Court and do no need to be reiterated in this Memorandum. However, the specifics of that day as they apply to Mr. O'Malley need to be clarified prior to the Court's sentencing determination.

As of June of 2021 Mr. O'Malley was a sixty-three (63) year old (DOB: 10/16/57) commercial fisherman who lived in Ft. Walton Beach, Florida, and fished commercially from Georgia throughout the Atlantic and Gulf Coast of Florida and through the Gulf of Mexico to Louisiana.

Mr. O'Malley has pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), to wit: Parading, Demonstrating, or Picketing in the Capitol Building. The presentencing investigation report which was prepared by United States Probation Officer Hannah Field accurately represents Mr. O'Malley's history.

Mr. O'Malley, as a supporter of then President Donald J. Trump, traveled by himself to a political rally that then President Trump conducted at the Capitol on January 6, 2021. The Government has alleged that Mr. O'Malley brought his softball helmet with a mask to Washington, D.C. because it seems, in their opinion, he was planning on committing some sort of violent act wherein the reality is that, during the time leading up to the election and afterwards at the Trump rallies, there were fears of many of the Trump attendees that they would be attacked or harmed by the ANTIFA groups throwing rocks, pieces of concrete, or other debris at the rally participants. As a result, Mr. O'Malley did, in fact, wear that softball helmet with a face mask as protection against the potential attack by the ANTIFA elements. There is no evidence, and Mr. O'Malley vehemently denies, that he was in contact with any group of people that intended to attack the Capitol or to riot at the conclusion of the rally. Toward the conclusion of the rally, the speakers indicated that then President Donald J. Trump was going to speak to the attendees at the Capitol Building and Mr. O'Malley along with numerous other rally attendees went to the United States Capitol. At the time Mr. O'Malley went to the Capitol there was no intent on his part to, "storm the Capitol Building"; however, Mr. O'Malley being caught up in the midst of the rally and the emotion, did, in fact, enter the Capitol Building through the Brumidi Corridor. Mr. O'Malley did take "selfies" of himself in the Capitol Building, and unfortunately quoted statements that were made by the speakers at the rally that the Capitol was, "the house of the people," and that they took control of that house. At no time did Mr. O'Malley have any physical confrontations with Capitol Police or any other law enforcement officers; nor, did he commit any property destruction or engage in any form of violence while at the Capitol. Mr. O'Malley did not go to social media to publish pictures of himself at the Capitol Building, nor did he go on social media at any time to brag about his entering the Capitol or otherwise participating in what became a riot.

During the Government's investigation of the actions of the participants at the Trump Rally as well as the subsequent "March on the Capitol," Mr. O'Malley was straightforward with his discussions with the agents of the FBI knowing that he may well be indicted for his entering the Capitol Building. As the Government stated on Page Thirteen (13) of their Sentencing Memorandum, Mr. O'Malley has "eschewed social media and has not attempted to publicly defend his actions or the actions of others who were part of the Capitol siege on January 6, 2021." Additionally, the Government has admitted Mr. O'Malley was forthcoming during the FBI investigation and that no evidence was discovered of any violence against law enforcement or other people on January 6, 2021.

In the Government's Sentencing Memorandum, they have noted that some of the defendants who have been sentenced as a result of their activities on January 6, 2021 have shown "false remorse" or appeared before their particular Judges with "crocodile tears." In this particular case, by virtue of his plea to the Court, Mr. O'Malley has been sincere in his remorse for his actions and has shown that through his cooperation with the Government, as well as his acceptance of responsibility. On page sixteen (16) of the Government's Sentencing Memorandum, the Government, in paragraph one (1) speaks to factors as to sentencing. Mr. O'Malley did, in fact, enter the Capitol Building, but did not use violence to enter the building, nor did he use violence against any member of law enforcement, nor did he encourage violence in any way. Mr. O'Malley did not commit any property destruction to the Capitol and did not encourage anyone to commit acts of destruction within the Capitol Building. Mr. O'Malley did not, in any way, destroy evidence, did not go on social media to praise the actions of those who entered the Capitol, and was not in the Capitol for more than sixteen (16) minutes. The Government suggests that Mr. O'Malley came close to the Senate Floor, however, there is no indication that Mr. O'Malley knew

where he was within the Capitol and stated to law enforcement that he walked into the Capitol with the crowd, followed the crowd, and exited the Capitol Building. There is a photograph of Mr. O'Malley in front of a group of people but there is no indication that he was a "leader" of that group of people prior to walking the stairs to the second floor of the Capitol. There is certainly no way to judge anyone's remorse or contrition as a result of actions they have taken in the past. However, the fact that Mr. O'Malley has cooperated fully with law enforcement, has complied with all conditions of his Pretrial Release, and has not bragged to anyone about being at the Capitol, support his remorse for his conduct on January 6, 2021. Mr. O'Malley does have a criminal history, however, that criminal history has revolved around alcohol consumption and in the Presentence Investigation Report, it is noted that Mr. O'Malley's family has a history of alcoholism which is reflected by both his brother and father (Page 22). Mr. O'Malley has expressed his regret for the actions of January 6, 2021 and has made numerous statements that he is appreciative of the benefits that he has received as a citizen of the United States. Mr. O'Malley has consistently stated that there is nowhere else where someone can work and achieve what he has achieved with a sixth (6th) grade education, leaving school and starting work at the age of approximately thirteen (13), and to start captaining fishing vessels at the age of sixteen (16). As the Court is aware from the Presentence Investigation Report, Mr. O'Malley suffered from dyslexia and took several years to graduate from the sixth (6th) grade at which time he left school because of being called dumb and being made fun of because of his undiagnosed dyslexia.

    Mr. O'Malley, as reflected in the Presentence Investigation Report, is married and supports his wife and himself through his commercial fishing. The Court should note that Mr. O'Malley's commercial fishing is conducted on a twenty plus (20+) foot boat for which he is the Captain and crew. Any period of incarceration or home detention would cause Mr. O'Malley to lose his fishing

business due to the fact that he has to "follow the fish" where they are running and where he can find them. Incarceration will remove Mr. O'Malley's catch from the chain of commerce supply when the Country needs its food producers to provide the American people with access to food, and, in Mr. O'Malley's case, fresh seafood that is becoming scarce. During the course of the progression of the instant case, Mr. O'Malley has been diagnosed with Cancer and enclosed with this memorandum are his latest diagnoses. On April 14, 2022, Mr. O'Malley has been scheduled for a stress test prior to surgery which will occur within two weeks (2) of the stress test. The surgery is to remove the carcinoma from Mr. O'Malley's lung, and it is Mr. O'Malley's understanding that at the conclusion of the surgery he will be hospitalized for a period of five (5) days and then be released to his home where he will have to recover for approximately one (1) month. Being self-employed, Mr. O'Malley will obviously not receive any income from the date of sentencing for approximately six (6) to seven (7) weeks after the sentencing if the surgery and recovery go as anticipated. Mr. O'Malley would request this Court sentence him to a period of probation with the amount of community service work the Court deems appropriate. The only requests Mr. O'Malley has as to his probationary status would be that he be allowed to continue in his occupation as a commercial fisherman. The Pretrial Release Services out of The Northern District have supervised Mr. O'Malley and he has complied with all requirements they have placed upon him in reference to reporting and getting permission to travel for commercial fishing endeavors.

In summary, the best explanation for the behavior of Mr. O'Malley and, in all likelihood,

the majority of the defendants similarly charged, is that President Trump took advantage of the loyalty of his supporters who believed in his style of populist government.

Respectfully submitted,

MICHAEL J. GRIFFITH, ESQUIRE  
Florida Bar # 192447  
Attorney for Defendant  
Timothy Earl O'Malley

MJG/tja  
Enclosures

cc: Sean Murphy, Assistant U.S. Attorney  
     Timothy Earl O'Malley

North Okaloosa Medical Center
151 E. Redstone Avenue
Crestview, FL 32539
850 689 8140

IMAGING REPORT
--------------------------------------------------------------------

NAME: OMALLEY, TIMOTHY

MRN: 383711           Room #:                    DOB: 10/16/1957
Account #: 7041956    Bed #:                     Age: 64
Patient Type: RA1     Exam Date/Time:            Sex: M
                      01/27/2022 13:02:00

Order #:              Accession #:               Exam Description:
100                   70419560000100             PET-IMG/CT SKL-THI (MOB)

Dictated by:              Deborah Pevsner
Ordering Physician:       GWINNUP, ANN
Attending Physician:      GWINNUP, ANN
Primary Care Physician:   GWINNUP, ANN
--------------------------------------------------------------------
FINAL REPORT

EXAMINATION: Nuclear Medicine Body PET/CT

INDICATION: Left lung mass
CLINICAL HISTORY: Left lung mass. There are year smoker history, stopped 12 years ago.
COMPARISON EXAMINATIONS: none
-Dose: 16.3 mCi of F-18 FDG, I.V.
-Contrast: I.V. none ; oral none.
-Glucose: 107 mg / dl
(Capillary Blood Glucose measured at the time of injection)

After allowing for an appropriate amount of time for uptake of the radiotracer, tomographic image acquisition was performed with PET and CT, from the base of the brain to the mid thighs. Additional dedicated imaging was performed of the head & neck. Anatomic imaging was performed during normal tidal respiration which potentially creates edge distortion due to motion artifact(s).

WITHOUT i.v. / oral contrast
The CT examination was performed without intravenous / oral contrast for the purpose of attenuation correction and is considered limited and 'non-diagnostic' which precludes evaluation of solid organ parenchyma, characterization of solid masses, or depiction of subtle vascular pathology. These non-diagnostic, non-contrast enhanced CT images obtained during tidal respiration, provide only a limited assessment of solid and hollow viscera, and do not replace diagnostic quality contrast enhanced CT scans.

WITH i.v. / oral contrast
The CT examination was performed following the administration of I.V. / oral contrast and is considered diagnostic, as well as provide attenuation correction for the scintigraphic imaging.

Page 1 of 4

North Okaloosa Medical Center
151 E. Redstone Avenue
Crestview, FL 32539
850 689 8140

IMAGING REPORT
---------------------------------------------------------------------

NAME: OMALLEY, TIMOTHY

MRN: 383711           Room #:                    DOB: 10/16/1957
Account #: 7041956    Bed #:                     Age: 64
Patient Type: RA1     Exam Date/Time:            Sex: M
                      01/27/2022 13:02:00

Order #:              Accession #:               Exam Description:
100                   70419560000100             PET-IMG/CT SKL-THI (MOB)

Dictated by:              Deborah Pevsner
Ordering Physician:       GWINNUP, ANN
Attending Physician:      GWINNUP, ANN
Primary Care Physician:   GWINNUP, ANN
---------------------------------------------------------------------

FINAL REPORT

The PET and CT images were reconstructed in the axial, coronal, and sagittal planes and viewed in a co-registered fashion, and independently in axial planes.

FINDINGS:
---------------

HEAD and NECK:

 - The included portions of the brain are grossly unremarkable. There is carotid calcification. There is streak artifact from the patient's dental work. There is no focal or suspicious increased FDG uptake. There is no pathologic cervical lymphadenopathy for technique.

THORAX:

 - There is mild breathing motion artifact with dependent atelectasis. There is a spiculated left upper lobe perihilar mass that measures approximately 2.7 cm AP dimension. It is hypermetabolic with increased FDG uptake. The max SUV is 5.1. There is no other discrete pulmonary nodule. The heart and mediastinum are overall unremarkable. There is mitral and aortic valve calcification. There are few scattered shotty mediastinal lymph nodes, without increased FDG uptake. There is no pathologic hilar lymphadenopathy. There are few scattered shotty axillary lymph nodes with prominent lymph node on the right, without increased FDG uptake. Lipoma noted incidentally along the lateral left chest wall between the musculature, simple appearance.

ABDOMEN and PELVIS:

Page 2 of 4

North Okaloosa Medical Center
151 E. Redstone Avenue
Crestview, FL 32539
850 689 8140

IMAGING REPORT
---------------------------------------------------------------

NAME: OMALLEY, TIMOTHY

MRN: 383711                Room #:                        DOB: 10/16/1957
Account #: 7041956         Bed #:                         Age: 64
Patient Type: RA1          Exam Date/Time:                Sex: M
                           01/27/2022 13:02:00

Order #:                   Accession #:         Exam Description:
100                        70419560000100       PET-IMG/CT SKL-THI (MOB)

Dictated by:               Deborah Pevsner
Ordering Physician:        GWINNUP, ANN
Attending Physician:       GWINNUP, ANN
Primary Care Physician:    GWINNUP, ANN
---------------------------------------------------------------

FINAL REPORT

- There is questionable mild fatty change of liver for technique. The spleen, pancreas and gallbladder are unremarkable for technique. There is no adrenal mass. There is physiologic activity in the kidneys and urinary system and throughout the bowel. The appendix is intact. There is sigmoid diverticulosis. There is a small hiatal hernia. There is no pathologic lymphadenopathy. There is no focal suspicious FDG uptake. The prostate is mildly prominent, otherwise unremarkable for technique.

OSSEOUS / MISC:

- Focal area of sclerosis in the left greater trochanter most likely bone island. There is mild degenerative change of the skeleton. There is no significant anatomic abnormality or focal suspicious FDG uptake.

Bone scan is more sensitive for certain types of metastases.

CONCLUSION:
1. Hypermetabolic left perihilar mass consistent with primary bronchogenic malignancy. Recommend histopathology correlation.
2. There is no pathologic lymphadenopathy or evidence of metastatic disease.
3. Additional findings as above.


Please note:
Standardized Uptake Value (SUV) measurements are measured as a maximum and reported as a maximum SUV in representative areas of viable malignancy for purposes of follow-up. Measured SUV values will generally increase with the time after injection, decrease with increased blood glucose levels, and vary with high body adipose (as opposed to lean body mass), different acquisition and processing and

Page 3 of 4

850 689 8140

IMAGING REPORT

---

NAME: OMALLEY, TIMOTHY

MRN: 383711  
Account #: 7041956  
Patient Type: RA1  

Room #:  
Bed #:  
Exam Date/Time:  
01/27/2022 13:02:00  

DOB: 10/16/1957  
Age: 64  
Sex: M  

Order #:  
100  

Accession #:  
70419560000100  

Exam Description:  
PET-IMG/CT SKL-THI (MOB)  

Dictated by:            Deborah Pevsner  
Ordering Physician:     GWINNUP, ANN  
Attending Physician:    GWINNUP, ANN  
Primary Care Physician: GWINNUP, ANN  

---

FINAL REPORT

filtering methods, and even different PET devices. If all these factors can be held constant, then the change in SUV can be an important measure of change in metabolic activity in tumor, infection and inflammation after treatment.

Created and electronically signed by: Deborah Pevsner on 1/27/2022 1:08 PM

CC: GWINNUP, ANN  
    GWINNUP, ANN  
    GWINNUP, ANN  

Page 4 of 4



**Baptist Health Care**
Department of Pathology
1000 West Moreno St.
Pensacola, FL 32501
Tel: (850) 434-4658
Fax: (850) 469-2354

# CYTOLOGY REPORT

| | | | | |
|---|---|---|---|---|
| Patient Name: | Omalley, Timothy E. | Client: | Baptist Hospital | Accession #: **P22-429** |
| Med. Rec. #: | 2000178715 | Location: | GASTROENTEROLOG | Collected: 3/21/2022 |
| Soc. Sec. #: | 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 | Account #: | 20000007059318 | Received: 3/22/2022 |
| DOB: | 10/16/1957 (Age: 64) | | | Reported: 3/23/2022 |
| Gender: | M | | | |
| Submitting Physician: | JOHN GARY MD | | | |

### Specimen(s) Received
A: Lavage LUL
B: Brushing LUL
C: LUL #1
D: LUL #2
E: LUL #1 cell block
F: LUL #2 cell block

### Final Diagnosis
A: LUNG, LEFT UPPER LOBE, LAVAGE:
   - NEGATIVE FOR MALIGNANT CELLS.
   - CELL COUNT:
     MACROPHAGES: 66%
     NEUTROPHILS: 16%
     LYMPHOCYTES: 18%
     EOSINOPHILS: 0%

B: LUNG, LEFT UPPER LOBE, BRONCHIAL BRUSHINGS:
   - NEGATIVE FOR MALIGNANT CELLS.
   - BENIGN BRONCHIAL CELLS PRESENT.

C: LUNG, LEFT UPPER LOBE #1, FINE NEEDLE ASPIRATION:
   - POSITIVE FOR ADENOCARCINOMA.

D: LUNG, LEFT UPPER LOBE #2, FINE NEEDLE ASPIRATION:
   - POSITIVE FOR ADENOCARCINOMA.

E: LUNG, LEFT UPPER LOBE #1, CELL BLOCK:
   - ACELLULAR/NONCONTRIBUTORY CELL BLOCK.

F: LUNG, LEFT UPPER LOBE #2, CELL BLOCK:
   - ACELLULAR/NONCONTRIBUTORY CELL BLOCK.

### Comment
Please also see concurrent biopsy case S22-2952.

**Electronically Signed By BENJAMIN J. HAVARD MD**
Vivid Pathology
3/23/2022 13:31

### Clinical History
Left upper lobe mass

### Gross Description
A:  Specimen is labeled "Omalley, Timothy E., lavage LUL." Container and requisition match. Received are 14 mL of cloudy brown Saccomanno fluid for cytospin.

B:  Specimen is labeled "Omalley, Timothy E., brushings LUL." Container and requisition match. Received is 1 quick-read slide, 1 alcohol-fixed slide and 12 mL of cloudy brown Saccomanno fluid for cytospin.

C:  Specimen is labeled "Omalley, Timothy E., FNA LUL #1." Container and requisition match. Received are 3 quick-read slides, 3 alcohol-fixed slides and 8 mL of cloudy brown Saccomanno fluid for cytospin and cell block (E).

D:  Specimen is labeled "Omalley, Timothy E., FNA LUL #2." Container and requisition match. Received are 8 mL of cloudy green Saccomanno fluid for cytospin and cell block (F).

E:  Specimen is labeled "Omalley, Timothy E., FNA LUL#1 cell block." Container and requisition match. Received is a 2.3 x 2.1 x 0.6 cm aggregate of fluid entirely submitted in block E1.

F:  Specimen is labeled "Omalley, Timothy E., FNA LUL #2 cell block." Container and requisition match. Received is a 2.5 x 2.2 x 0.6 cm aggregate of fluid entirely submitted in block F1.

dc/3/22/2022

### Microscopic Description
A: Two slides screened by Vivid Pathology Cytotechnologists.
B: Four slides screened by Vivid Pathology Cytotechnologists
C: Eight slides screened by Vivid Pathology Cytotechnologists.
D: Two slides screened by Vivid Pathology Cytotechnologists.

### Preliminary Diagnosis
Intraoperative Diagnosis/quick read diagnosis

Lung, left upper lobe, fine needle aspiration:
- Three air-dried smears reviewed.
- Positive for non-small cell carcinoma, favor adenocarcinoma.
Results reported to Dr. Gary by Dr. Havard at 1:59 p.m. on 03/21/2022.

Lung, left upper lobe, bronchial brushings:
- One air-dried smear reviewed.
- Negative for malignant cells.
Results reported to Dr. Gary by Dr. Havard at 2:11 p.m. on 03/21/2022.